Slip Op. 19 - 87

 UNITED STATES COURT OF INTERNATIONAL TRADE

AG DER DILLINGER HUTTENWERKE,

 Plaintiff,

ILSENBURGER GROBBLECH GMBH, Before: Leo M. Gordon, Judge
SALZGITTER MANNESMANN
GROBBLECH GMBH, SALZGITTER Consol. Court No. 17-00158
FLACHSTAHL GMBH, SALZGITTER
MANNESMANN INTERNATIONAL GMBH,
and FRIEDR. LOHMANN GMBH,

 Consolidated Plaintiffs,
and

THYSSENKRUPP STEEL EUROPE AG,

 Plaintiff-Intervenor,

 v.

UNITED STATES,

 Defendant,

NUCOR CORPORATION and SSAB
ENTERPRISES LLC,

 Defendant-Intervenors.

 OPINION and ORDER

[Considering Commerce’s Final Determination on the application of partial adverse facts
available.]

 Dated: July 16, 2019

 Marc E. Montalbine, Gregory S. Menegaz, and Alexandra H. Salzman, deKieffer
& Horgan, PLLC, of Washington, DC for Plaintiff AG der Dillinger Hüttenwerke and
Consolidated Plaintiff Friedr. Lohmann GmbH.

 David E. Bond, Richard G. King, Ron Kendler, and Allison J. Kepkay, White and
Case LLP, of Washington, DC, for Consolidated Plaintiffs Ilsenburger Grobblech GmbH,
Consol. Court No. 17-00158 Page 2

Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter
Mannesmann International GmbH.

 Robert L. LaFrankie, Crowell & Moring LLP, of Washington, DC, for Plaintiff-
Intervenor thyssenkrupp Steel Europe AG.

 Vito S. Solitro, Trial Attorney, Commercial Litigation Branch, Civil Division,
U.S. Department of Justice, of Washington, DC, for Defendant United States. With him
on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson,
Director, and Tara K. Hogan, Assistant Director. Of counsel was Natan P. L. Tubman,
Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement
and Compliance, of Washington, DC.

 Alan H. Price, Christopher B. Weld, and Stephanie M. Bell, Wiley Rein LLP,
of Washington, DC, for Defendant-Intervenor Nucor Corporation.

 Gordon, Judge: This action involves the final affirmative antidumping duty

investigation of certain carbon and alloy steel cut-to-length plate (“CTL plate”) from the

Federal Republic of Germany. See Certain Carbon and Alloy Steel Cut-to-Length Plate

from the Federal Republic of Germany, 82 Fed. Reg. 16,360 (Dep’t of Commerce Apr. 4,

2017) (“Final Determination”), and accompanying Issues and Decision Memorandum, A-

428-844 (Dep’t of Commerce Mar. 29, 2017), available at

http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf (last visited this

date) (“Decision Memorandum”).

 Before the court are the motions for judgment on the agency record filed by Plaintiff

AG der Dillinger Hüttenwerke (“Dillinger”) and Consolidated Plaintiffs Ilsenburger

Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl

GmbH, Salzgitter Mannesmann International GmbH (collectively, “Salzgitter”), and Friedr,

Lohmann GmbH (all, together with Dillinger, “Plaintiffs”). See Pl. Dillinger Mem. in Supp.
Consol. Court No. 17-00158 Page 3

of Rule 56.2 Mot. for J. on the Agency R., ECF No. 40 1 (“Dillinger Br.”); Salzgitter Consol.

Pls.’ Rule 56.2 Mot. for J. on the Agency R., ECF No. 43 (“Salzgitter Br.”); Def.’s Mem.

Opp. Pls.’ Rule 56.2 Mots. for J. on the Admin. R., ECF No. 55 (“Def.’s Resp.”); Def.-

Intervenor Nucor Corporation Resp. Br., ECF No. 58; Reply Br. of Pl. Dillinger, ECF

No. 62 (“Dillinger Reply”); Reply in Supp. of Consol. Pls.’ Rule 56.2 Mot. for J. on the

Agency R., ECF No. 64 (“Salzgitter Reply”). Plaintiff-Intervenor thyssenkrupp Steel

Europe AG (“thyssenkrupp”) has also filed a brief in support of Plaintiff Salzgitter’s Rule

56.2 Motion. See Pl.-Intervenor’s Memorandum of Law in Support of Pl. Salzgitter’s Rule

56.2 Mot., ECF No. 41 (“thyssenkrupp Br.”). The court has jurisdiction pursuant to Section

516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i)

(2012), 2 and 28 U.S.C. § 1581(c) (2012).

 This opinion addresses Plaintiffs’ claims regarding the application of partial

adverse facts available (“AFA”) by the U.S. Department of Commerce (“Commerce”) for

certain home market CTL plate sales made by their respective affiliates. The remaining

issues, which are raised only by Dillinger, will be addressed in a separate opinion.

 I. Background

 In its initial questionnaire, Commerce asked respondents Dillinger and Salzgitter

to provide, among other things, the identity of the manufacturer of each CTL plate sold

1 All citations to parties’ briefs and the agency record are to their confidential versions
unless otherwise noted.
2 Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of

Title 19 of the U.S. Code, 2012 edition.
Consol. Court No. 17-00158 Page 4

during the period of investigation (“POI”) (April 1, 2015, through March 31, 2016), along

with its respective price, in their respective United States’ and German sales databases.

See Salzgitter Questionnaire at B-25, C-31; Dillinger Questionnaire at B-25, C-31.

Commerce sent multiple supplemental questionnaires to Dillinger and Salzgitter

requesting additional information covering various subjects, including the identity of the

manufacturer(s) of certain home market CTL plate sales that they claimed could not be

provided without inordinate difficulty.

 Dillinger and Salzgitter made sales during the POI in the home market to affiliated

parties, as defined in 19 U.S.C. § 1677(33). Commerce accordingly tested those sales to

determine whether they were made at arm’s-length prices. See 19 C.F.R. § 351.403(c).

 Commerce preliminarily found that Dillinger’s reported sales to two affiliated

resellers did not pass the arm’s-length test. Id. Because of gaps in the reported

downstream sales of those affiliates, Commerce preliminarily treated all of their sales as

being Dillinger-produced CTL plate. Id. Commerce then requested additional information

from Dillinger for consideration of these sales for the final determination. Dillinger’s

affiliates were eventually able to gather some of the missing CTL plate manufacturer

information. See Dillinger’s Third Supplemental Section B&C Questionnaire Response

at 5, PD 434.

 Salzgitter, for its part, responded to Commerce’s initial questionnaire by stating

that certain downstream sales by its affiliated reseller were not being reported because it

could not identify the original manufacturer of the CTL plate sold without performing a

burdensome manual check. See Certain Carbon and Alloy Steel Cut-to-Length Plate from
Consol. Court No. 17-00158 Page 5

the Federal Republic of Germany, 81 Fed. Reg. 79,446 (Dep’t of Commerce Nov. 14,

2016) and accompanying Preliminary Decision Memorandum at 12, PD 436, available at

http://ia.ita.doc.gov/frn/summary/germany/2016-27313-1.pdf (last visited this date).

Salzgitter specifically noted that “while it is able to do so for customers upon request,

its accounting system does not track merchandise by manufacturer once placed into

inventory and, thus, it would be ‘unreasonably burdensome’ to obtain the requested

information.” Id. Commerce requested in two separate supplemental questionnaires that

Salzgitter provide these unreported sales in case the sales to the affiliated reseller failed

the arm’s-length test. Commerce preliminarily found that Salzgitter was able to report

these sales but chose not to identify all of its affiliated reseller’s sales of Salzgitter-

produced merchandise, therefore Commerce applied facts available, in part, with

an adverse inference to account for the affiliated reseller’s unreported downstream sales.

Id. Commerce indicated that it intended to examine the issue further at verification before

coming to a conclusion in the final determination. See id.

 In the end, Commerce found both Dillinger’s and Salzgitter’s efforts insufficient to

complete identification of the manufacturer and applied partial AFA to those CTL plate

sales when determining the applicable dumping margins. See Decision Memorandum

at 27–34, 61–64. For Dillinger, because its sales to its home market affiliate failed the

arm’s-length test and exceeded five percent of Dillinger’s total reported home market

sales during the POI, Commerce continued to include all affiliate transactions of CTL plate

of unidentified manufacturers but substituted for Dillinger’s reported prices the “highest

non-aberrational net price among Dillinger’s downstream home market sales.” For
Consol. Court No. 17-00158 Page 6

Salzgitter, Commerce included all of Salzgitter’s affiliates’ downstream home market CTL

plate sales with unidentified manufacturers, but applied the highest non-aberrational net

price among those sales to all such sales.

 II. Standard of Review

 The court sustains Commerce’s “determinations, findings, or conclusions” unless

they are “unsupported by substantial evidence on the record, or otherwise not in

accordance with law.” 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing

agency determinations, findings, or conclusions for substantial evidence, the court

assesses whether the agency action is reasonable given the record as a whole. Nippon

Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial

evidence has been described as “such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.” DuPont Teijin Films USA v. United States,

407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S.

197, 229 (1938)). Substantial evidence has also been described as “something less than

the weight of the evidence, and the possibility of drawing two inconsistent conclusions

from the evidence does not prevent an administrative agency’s finding from being

supported by substantial evidence.” Consolo v. Fed. Mar. Comm’n, 383 U.S. 607, 620

(1966). Fundamentally, though, “substantial evidence” is best understood as a word

formula connoting reasonableness review. 3 Charles H. Koch, Jr. Administrative Law and

Practice § 9.24[1] (3d ed. 2019). Therefore, when addressing a substantial evidence issue

raised by a party, the court analyzes whether the challenged agency action
Consol. Court No. 17-00158 Page 7

“was reasonable given the circumstances presented by the whole record.” 8A West’s Fed.

Forms, National Courts § 3.6 (5th ed. 2019).

 III. Discussion

 A. Resort to “Facts Available”

 “The manufacturer information is critical for the Department’s margin analysis

because the Department matches sales by, among other criteria, manufacturer.” Decision

Memorandum at 32. Without the identity on the record of the manufacturers of all CTL

plate transactions sold in the home market, Commerce faced the dilemma of how to treat

those sales in the margin calculation. The sole issue for the purpose of this opinion is

whether, as a solution to that problem, Commerce’s resort to “facts otherwise available”

(or “facts available”) with an adverse inference in its selection is reasonable (supported

by substantial evidence).

 Dillinger first challenges Commerce’s determination by arguing that it notified

Commerce of its difficulty in tracing the CTL plate manufacturer for some transactions

and requested accommodation pursuant to 19 U.S.C. § 1677m(c)(1) and contending that

Commerce never properly responded to that notification. Dillinger Br. at 20 (citations

omitted). However, as explained in Dillinger France S.A., v. United States, 42 CIT ___,

___, 350 F. Supp. 3d 1349, 1364 (2018), a § 1677m(c)(1) notice to Commerce must

include “a full explanation and suggested alternative forms in which” the information could

be provided. Dillinger’s notification to Commerce in the underlying proceeding here did

not suggest any alternative form(s) of information that Commerce could use in place of

the missing information. Dillinger’s notification lacked the required “suggested”
Consol. Court No. 17-00158 Page 8

alternatives, and therefore did not trigger Commerce’s obligations under § 1677m(c).

By contrast, Commerce properly alerted Dillinger and Salzgitter of their deficiencies in

providing the identities of all the manufacturers of all CTL plate sold by their affiliates. See

19 U.S.C. § 1677m(d) (upon receipt of non-compliant response to request for information,

Commerce required to inform respondent promptly about “the nature of the deficiency”).

 Whenever information necessary to a determination is missing from the record,

Commerce must rely on other facts of record as an appropriate surrogate.

19 U.S.C. § 1677e(a)(1). Subsection 1677e(a)(2) specifies that whenever an interested

party or other person (A) “withholds,” or (B) “fails” to provide requested information by the

deadlines set for its submission and in the form and manner requested, or

(C) “significantly impedes” the proceeding, or (D) provides requested information that

cannot be verified, Commerce must resort to facts available. 19 U.S.C. § 1677e(a)(2).

 A § 1677e(a)(2)(B) “failure” generally covers, but is not limited to, the process of

responding to and providing requested information. Such a “failure” is subject to the

notification to Commerce of difficulties in responding, discussed above. See 19 U.S.C.

§ 1677m(c). It is also subject to 19 U.S.C. § 1677m(e), which provides that Commerce

“shall not decline to consider” necessary “information” if (1) the submission is timely,

(2) the information is verifiable, (3) it is “not so incomplete that it cannot serve as a reliable

basis for reaching the applicable determination,” (4) the interested party “acted to the best

of its ability” to provide it, and (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).
Consol. Court No. 17-00158 Page 9

 Plaintiffs argue that their submissions in response to Commerce’s questionnaires

met all of these criteria. However, the “information” to which § 1677m(e) refers, in the

context of this proceeding, is the missing manufacturer information, not the remainder of

“the information” that Plaintiffs submitted. Plaintiffs acknowledge that the identity of the

CTL plate manufacturers is relevant to whether home market transactions should or

should not be included in margin calculations, and that they did not identify all of them.

Plaintiffs thus cannot escape the conclusion that they failed to satisfy § 1677m(e) with

respect to that information. In short, Plaintiffs’ reliance upon § 1677m(e) is misplaced.

 As noted, Commerce disagreed with Plaintiffs that there was no “gap” in the record.

Plaintiffs argue, however, that the affected transactions were “small,” and they attempt to

minimize the lack of full information on the identities of the CTL plate manufacturers and

that information’s relevance by arguing that there were no “gaps” in their respective,

verified, affiliate home market price databases. See Salzgitter Br. at 4–16; Dillinger Br.

at 20–22, 24.

 However, the price data for those transactions were not the problem. Indeed, they

were irrelevant to solving Commerce’s conundrum of an incomplete record. The real

problem for Commerce was that it could not determine whether to include or exclude the

CTL plate transactions from Dillinger’s and Salzgitter’s margin calculations because of

the missing manufacturer information. Accordingly, Commerce reasonably determined

that it must resort to “facts available” pursuant to 19 U.S.C. § 1677e(a).
Consol. Court No. 17-00158 Page 10

 B. Adverse Inference

 Having determined that it had to resort to facts available to substitute for the

missing CTL plate manufacturer information, Commerce then faced the related question

of whether the circumstances called for an adverse inference. Commerce concluded that

the responsibility for the dilemma before it rested with respondents Dillinger and

Salzgitter, who had failed to provide the necessary information. Cf. QVD Food Co. v.

United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (adequacy of record).

 19 U.S.C. § 1677e(b) provides that if Commerce finds that an interested party has

failed to cooperate by not acting to the best of its ability to comply with a request for

information, it “may use an inference that is adverse to the interests of that party in

selecting from among the facts otherwise available.” This standard “requires the

respondent to do the maximum it is able to do.” Nippon Steel Corp. v. United States,

337 F.3d 1373, 1382 (Fed. Cir. 2003). “The statutory trigger for Commerce’s

consideration of an adverse inference is simply a failure to cooperate to the best of

respondent’s ability, regardless of motivation or intent.” Id. Pursuant to this standard, it is

irrelevant whether the respondent was intentionally evasive, or whether respondent

thought it had a valid legal basis for withholding the requested information. See Nan Ya

Plastics Corp. v. United States, 810 F.3d 1333, 1347 (Fed. Cir. 2016) (“Congress decided

what requirements Commerce must fulfill in reaching its determinations, § 1677e(b), and

we do not impose conditions not present in or suggested by the statute’s text”).

 Respondents are required to “(a) take reasonable steps to keep and maintain full

and complete records documenting the information that a reasonable importer should
Consol. Court No. 17-00158 Page 11

anticipate being called upon to produce; (b) have familiarity with all of the records it

maintains in its possession, custody, or control; and (c) conduct prompt, careful, and

comprehensive investigations of all relevant records that refer or relate to the imports in

question to the full extent of the importers’ ability to do so.” Nippon Steel, 337 F.3d

at 1382. Applying these standards, Commerce explained that “[t]he information in

question . . . is the type of information that a large steel manufacturer such as Dillinger

should reasonably be able to provide, in order to provide its customers with the mill test

certificates for the CTL plate they purchase.” Decision Memorandum at 64. Commerce

presumed that Dillinger was “familiar with all of the records” maintained by its affiliates

and that those affiliates “possessed information about the manufacturers of the CTL plate

at issue, yet reported the producers of only some of the CTL plate, but not all.” Id.

Commerce found that “Dillinger’s failure to report the requested manufacturer information,

accurately and in the manner requested, using the records over which it maintained

control, indicates that Dillinger did not act to the best of its ability to comply with our

requests for information.” Id.

 Commerce reasoned similarly as to Salzgitter that the identity of the manufacturers

of the CTL plate resold by its affiliate “is the type of information that a respondent should

have reasonably anticipated being required to provide to its customers for quality

assurance and warranty claims[,]” and at verification “Salzgitter was able to identify the

manufacturer of a sale in the [separate] sales database when it attempted to obtain that

information.” Decision Memorandum at 33.
Consol. Court No. 17-00158 Page 12

 Commerce stressed that it provided Dillinger and Salzgitter “multiple” opportunities

to remedy the deficiencies in their affiliates’ downstream sales, and that Plaintiffs did not

remedy those deficiencies. Id. at 33–34, 64. Because the additional requested information

was not forthcoming, Commerce determined that Dillinger and Salzgitter had not

cooperated to the best of their ability by providing the necessary information to determine

how to attribute the transactions with unknown manufacturers.

 Plaintiffs vigorously contest this determination. They argue that they exerted their

best efforts to comply with Commerce’s requests for information, and that there was no

need or justification for imposing an adverse inference upon resort to facts available. Both

Plaintiffs contend that it was unreasonable for Commerce to determine that they

“withheld" information or “failed” to (fully) respond because Nippon Steel does not require

perfection.

 Dillinger argues that it exerted considerable efforts in complying with Commerce’s

information requests, and that “[f]ar from showing that Dillinger failed to put forth its

maximum effort to provide the Department with information, the record shows that

Dillinger expended Herculean efforts to provide the Department with all the information it

requested.” Dillinger Reply at 30–32. Dillinger also maintains that the very fact that

Commerce treated all the transactions for which a manufacturer could not be identified

as if they had been produced by Dillinger and included all of them in the margin calculation

implies that this “fully resolved” the issue of the missing manufacturer information. Id.

Dillinger’s conclusion, though, is not apparent from the record. The record does not

disclose whether attribution of the manufacture of all downstream sales of CTL plate in
Consol. Court No. 17-00158 Page 13

the home market to Dillinger and inclusion of unadjusted prices for all such sales in the

margin calculation would have been adverse, neutral, or beneficial. Dillinger’s best efforts

arguments are therefore unpersuasive.

 Salzgitter, for its part, emphasizes that it “did not refuse” to provide requested

information. It contends that its affiliate’s record-keeping systems during the POI complied

with the rules and regulations that apply to its commercial activities, and that a manual

search for the missing information was only theoretically possible. Further, Salzgitter

argues that Commerce “verified," based on the 10-minute turnaround time it took to locate

and match one CTL plate manufacturer at that time, that it would have taken 4,667 hours

for Salzgitter to provide the missing manufacturer information by manually correlating its

two disparate financial accounting and mill certificate management systems. See

Salzgitter Reply at 4–5 (citations omitted).

 Nevertheless, whether that single incident amounts to verification of the time and

effort involved to “resolve” the missing manufacturer information for the affected CTL plate

transactions, it neither excuses nor resolves the problem that Commerce still faced as to

whether to include or exclude those transactions in Salzgitter’s margin calculation.

Salzgitter reiterates that in response to one of Commerce’s requests, it submitted

a “separate database” of CTL plate sales pertaining to transactions with missing

manufacturer data. Salzgitter proposed three options to Commerce for using this

“separate”/revised database in its margin calculation, namely, that Commerce could

(1) treat all such sales as if they were not Salzgitter-manufactured plate, (2) treat all such

sales as if they were Salzgitter-manufactured plate, or (3) treat some of the sales in the
Consol. Court No. 17-00158 Page 14

separate database as if they were Salzgitter-manufactured plate based on the ratio of

plate purchased from Salzgitter affiliates versus other mills during the period of

investigation, and that if any of these proposals had been adopted the dumping margins

“would have been nil.” Salzgitter Br. at 14–15; Salzgitter Reply at 10.

 Commerce interpreted Salzgitter’s proposals as arguing for “neutral” facts

available to substitute for the missing CTL plate manufacturer information. See Decision

Memorandum at 31. Commerce, at verification, highlighted that Salzgitter “was able to

identify the manufacturer of a sale in the additional SMSD sales database when it

attempted to obtain that information” for the final determination. Decision Memorandum

at 32 (footnote omitted). Commerce further found that Salzgitter’s three proposals lacked

the type of “connectivity” or indication that any of these proposals would reasonably reflect

the missing CTL plate manufacturer information for the relevant transactions.

 The court cannot understand why Salzgitter did not just simply conduct a statistical

analysis of the 28,000 CTL plate sales with missing manufacturer information, using

a sufficient and randomized sample size that was then manually matched to the missing

manufacturer information from its legacy mill certificate management system. This

approach might have established a statistically valid extrapolation, rather than Salzgitter’s

mere speculation, of the missing manufacturer information based on the sample’s actual

ratio of Salzgitter-manufactured to non-Salzgitter-manufactured CTL plate sales. This

approach would also have presented Commerce with an evidentiary proffer that

Commerce would have been hard pressed to reasonably reject, and it would have better

carried Salzgitter’s burden to create an adequate record. QVD Food, supra, 658 F.3d
Consol. Court No. 17-00158 Page 15

at 1324. And the court cannot understand why Salzgitter, having failed to figure out that

relatively straightforward approach out on its own, did not more completely avail itself of

the full operation of 19 U.S.C. § 1677m(c)(1) & (2) and promptly disclose its difficulties to

Commerce and request assistance to figure out a path to ascertain the necessary

information. An interested party’s unilateral assertion of difficulty, like Salzgitter’s here,

rather than a more straightforward request for help, is fraught with risk. See Maverick

Tube Corp. v. United States, 857 F.3d 1353, 1360–61 (Fed. Cir. 2018) (affirming

Commerce’s application of AFA where respondent failed to indicate that it was unable to

provide relevant information nor suggest alternative for provision of that information).

 In conclusion, the record does not appear as detailed with Plaintiffs’ efforts to

obtain the missing information as they argue before the court, and on those points the

court mainly confronts only self-serving statements or interpretations of the record.

Importantly, Plaintiffs fail to identify where the record indicates the effect, if any, on

Dillinger’s and Salzgitter’s margins if complete manufacturer information had been

provided for all home market CTL plate sales. Accordingly, taking the record as a whole,

Commerce’s imposition of an adverse inference in the selection of facts available is

reasonable.
Consol. Court No. 17-00158 Page 16

 C. The Selected Adverse Facts Available

 As partial AFA, for the final margin calculations Commerce applied the highest

non-aberrational net price observed among Plaintiffs’ downstream home market sales for

which the identity of the manufacturer of the CTL plate had not been reported to all such

sales. Decision Memorandum at 10, 11, 34, 64. Given this determination, Plaintiffs

challenge whether it was reasonable for Commerce to substitute downstream price

information covering CTL plate for which manufacturer information was missing from the

record.

 In Dillinger France, supra, the court was confronted with a near identical issue.

Compare Issues and Decision Memorandum for the Final Affirmative Determination in the

Less-Than-Fair-Value Investigation of Certain Carbon and Alloy Steel Cut-To-Length

Plate from France, A-427-828, at Cmt. 5 (Dep’t of Commerce Mar. 29, 2017), available

at https://enforcement.trade.gov/frn/summary/france/2017-06627-1.pdf (last visited this

date), with Decision Memorandum at Cmts. 2 & 20; see also Dillinger France, 42 CIT

at ___, 350 F. Supp. 3d at 1361–64 (discussing application of partial AFA to Dillinger

France for failure to report manufacturer of CTL plate in certain downstream home market

sales of affiliates). Plaintiff in that case argued that it (1) put forth its best efforts to provide

the price and manufacturer data requested by Commerce, and that (2) for transactions

where the manufacturer data was unknown but the sales price was contained in the

record, Commerce impermissibly replaced the record sales prices with the highest non-

aberrational net price among that plaintiff’s downstream home market sales. There, the

court upheld Commerce’s decision that an adverse inference was warranted, but also
Consol. Court No. 17-00158 Page 17

noted that “Commerce did not explain what authority permitted it to replace known

information with adverse facts available[,]” 42 CIT at ___, 350 F. Supp. 3d at 1364, and

remanded for further consideration. Here, the court does not reach the same conclusion,

as Commerce has clear statutory authority pursuant to 19 U.S.C. § 1677m(d)

to “disregard all or part of the original and subsequent responses” in an adverse inference

scenario. 19 U.S.C. § 1677m(d) (emphasis added).

 In any event, and importantly as to this issue, on remand Commerce “relied on the

Court’s statement that ‘the reliability of the reported sales prices has not been called into

question and there is no informational gap in the sale prices for Commerce to fill.”

See Final Results of Redetermination Pursuant to Court Remand at 6, Dillinger France

S.A. v. United States, No. 17-00159 (CIT Mar. 11, 2019), ECF No. 56-1. Commerce

elaborated that “[g]iven this holding, and contrary to Nucor’s argument that we should use

the highest non-aberrational price as partial AFA, we find that we cannot ignore record

information that is not in dispute, pursuant to the facts on the record of this investigation

and the Court’s decision.” Id. As a result, Commerce changed its application of partial

AFA and “1) treated these downstream home market sales transactions as Dillinger-

France produced plate, rather than treating these transactions as sales of plate produced

by an unrelated manufacturer; and 2) relied on the sales prices as reported.” Id. at 6–7.

However, in doing so, Commerce found that “because of the small number of affected

transactions whose prices are used as a basis for normal value and which are actually

compared to U.S. sale prices, these home market transactions have no measurable

impact on Dillinger-France’s estimated weighted-average dumping margin.” Id. at 6.
Consol. Court No. 17-00158 Page 18

 Reasoned decision-making requires a certain measure of consistency, which is

not present across the France and Germany investigations. As noted, the cases share

near identical (almost verbatim) Issues and Decision Memoranda on the AFA issue. The

court therefore orders Commerce and the parties to review whether the same correction

made in Dillinger France would have any material effect on the margins in this case, or if

it would be immaterial. If the parties conclude that a similar correction as ordered in

Dillinger France would materially affect the margins, the court will then remand this matter

to Commerce to make a similar adjustment to its application of partial AFA to Dillinger

and Salzgitter as it did in the Dillinger France remand with resulting adjustment of the

investigation’s margins. 3 Accordingly, it is hereby

 ORDERED that Commerce shall determine whether a similar correction as

ordered in Dillinger France would materially affect the margins in this action; and it is

further

 ORDERED that Commerce shall notify the court with the results of its analysis on

or before August 7, 2019.

 /s/ Leo M. Gordon
 Judge Leo M. Gordon

Dated: July 16, 2019
 New York, New York

3 Including the “All Others” rate. See thyssenkrupp Br. at 4.